**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

ERICA BEISWINGER, individually, and on
behalf of all others similarly situated,

               Plaintiff,

     v.

WEST SHORE HOME LLC, a Pennsylvania
company,

               Defendant.

Case No. 3:20-cv-01286-HES-PDB

## Economic Assessment of the Value of Remedial Relief
## in Connection with Class Action Settlement Agreement

**April 10, 2022**

**Prepared by**

**Jon Haghayeghi, Ph.D.**

J. Herbert Burkman & Associates
4026 Lemmon Avenue
Suite 200
Dallas, Texas 75219

jon@burkmaneconomics.com

1

## ECONOMIC ASSESSMENT OF THE VALUE OF REMEDIAL RELIEF

### I. INTRODUCTION

A class action settlement was reached on behalf of all persons in the United States to whom West Shore Home, LLC, either directly or by a vendor of West Shore Home, LLC, (1) whose telephone numbers Defendant obtained as a result of a Facebook ad campaign, and (2) who were called by or on behalf of Defendant (a) one or more times using a prerecorded voice and/or (b) two or more times in a twelve month period on a telephone number that had been registered with the National Do Not Call Registry for more than thirty days.[1] The lawsuit alleges that such contact by Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

The undersigned economist, Jon Haghayeghi, Ph.D., has been retained by Plaintiff's counsel to assess (the "Assessment") the benefits accruing to class members from the remedial relief the Settlement Agreement provides. The Assessment includes reviewing, analyzing, and evaluating the economic impact of the Settlement Agreement, and identifying the net benefits conferred on members of the class. The Assessment also identifies other positive externalities inuring to the favor of non-party beneficiaries and related parties. The Assessment measures the aggregate economic value of the Settlement to class members against the backdrop of conventionally accepted measurement methodologies extant within the discipline of economics and its sub-field, cost-benefit analysis (CBA).

It merits noting that the Assessment's quantitative analysis includes the monetized value of non-monetary remedial relief inherent in the Settlement Agreement.  By agreeing to change its practices to avoid non-compliance with the TCPA, Defendant West Shore Home, LLC has set in motion a series of positive benefits that may be readily valued for a broad swath of society.

In summary, the undersigned economist believes the Settlement Agreement has far-reaching societal effects and bestows positive economic externalities reaching well beyond the benefits directly bestowed on the parties subject to the Settlement Agreement included in the report herein.

---

[1] Erica Beiswinger, individually, and on behalf of all others similarly situated, Plaintiff, v. West Shore Home LLC, a Pennsylvania company Defendant. United States District Court for the Middle District of Florida, Settlement Agreement and Release. Case No. 3:20-cv-01286-HES-PDB

## II. QUALIFICATIONS

Dr. Haghayeghi joined J. Herbert Burkman & Associates economics consulting firm in 2009. He earned his bachelor's and master's degrees in Economics from Southern Methodist University, Dallas, Texas. In 2012, Dr. Haghayeghi represented the United States at the Institute for Studies on Economics and Employment, a conference hosted by Nobel Laureates in Economics in Iseo, Italy. He earned his Ph.D. in economics in 2017 from the Department of Economics, Claremont Graduate University, Claremont, California. Dr. Haghayeghi wrote his dissertation on weak-form efficiency in U.S. equity markets under the guidance of Dr. John Rutledge. Throughout his tenure in his doctoral program, he taught courses at California State Polytechnical University in the Department of Finance, Real Estate, and Law, Pomona, California.

Dr. Haghayeghi has taught at Loyola Marymount University, Department of Economics, Los Angeles, California. He has also taught valuation seminars on calculating economic damages in Las Vegas, San Diego, and Chicago in 2014, 2017, and 2021, respectively, to members of the American Rehabilitation Economics Association. Dr. Haghayeghi currently serves as the Executive Director of the State of Alaska's Commercial Fisheries Entry Commission, a quasi-judicial agency dedicated to preserving the economics of commercial fishing for the state.

## III. ECONOMICS OF THE SETTLEMENT AGREEMENT

### A. Assessing the Economic Value of the Settlement Agreement

As noted in the introduction, the discipline of economics provides the theoretical framework and quantitative methods central to assessing the benefits accruing to all persons affected by the Settlement Agreement. With respect to the settlement, review and analysis have identified the benefits inuring to the class and a broad spectrum of society.

#### 1. Economic Benefit

The primary economic benefit to consumers is the value provided by a change in West Shore Home, LLC's behavior. Ceasing the calling conduct assures all current and future targeted consumers will not experience interference of privacy from telemarketing calls by West Shore Home, LLC. In this matter, the absence of telemarketing calls from West Shore Home, LLC, assures consumers of telephone privacy and non-interference with their daily lives. At the same time, revised practices assure West Shore Home, LLC that in the future consumers may not challenge its telemarketing practices. The

3

revisions to practices have three broad categories of beneficiaries, including 1) targeted consumers 2) West Shore Home, LLC, and 3) society in general.  The revisions to practice represent assured privacy to consumers and relief of displeasure. It is understood that the pre-class action lawsuit status quo has been permanently altered. Future targeted consumers will never need to be concerned with the diminishment of privacy and pleasure at any time.  Society is likely spared the need to relieve any future party that experiences damages.

### 2. Determining Willingness-to-Pay

To determine a reasonable aggregate value of the relief brought about by the Settlement Agreement, economists rely on the methods and procedures established in the discipline of economics and its sub-field, cost-benefit analysis.   In assessing benefits, cost-benefit analysts routinely rely on consumers' *willingness-to-pay* to gain knowledge or remove an undesired feature impacting consumer satisfaction derived through a purchase. The willingness-to-pay methodology permits direct assessment of a range of reasonable choices in the decision process in this matter.  Economists identify value associated with each choice.

### 3. Valuing Privacy and the Absence of Telemarketing Calls

As with all decisions to spend on goods and services, consumers seek to maximize their satisfaction, or utility, through their purchases. Relatedly, in their selection and purchase of any good or service, consumers exhibit a willingness-to-pay for the absence of an undesired feature. CBA allows economists to measure and then place a value on benefits that derive from how much consumers are willing-to-pay for the absence of an undesired feature, or in this case, the forbiddance of unsolicited telemarketing calls. With reference to the mentioned practices of West Shore Home, LLC, any phone call made *implies* displeasure and diminishment of privacy. What value does the absence of an undesired feature have for consumers?

### 4. Determining Value and Benefit

Value is most readily observed through the study of consumer behavior with respect to TCPA. Using data from the federal "Do Not Call" registry, best estimates indicate that consumers are willing to pay $8.25 to avoid unwanted calls for one year.[2] Willingness-to-pay reveals a range of reasonable values representing the diversity of consumer preferences.[3]

---

[2] See Appendix 2, Table 1 for a reasonable range of plausible price points for purchasing privacy and the absence of displeasure.
[3] Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007).

With the range of prices presented in Appendix 1, Table 1, Table 1.A, Table 1.B, Table 1.C, and Table 2, Table 2.A, Table 2.B, and Table 2.C, the undersigned economist has relied on federal government-collected telephone number assignment data and peer-reviewed research on the value of privacy to assess the societal value of the remedial relief.

Products designed to stop undesired telemarketing calls range in price from $1.99 to $3.99 per month. The Settlement Agreement, much like these products, assists in the removal of a specific undesired feature. The known market value of such products serves to assist in measuring of the economic benefit bestowed on each class member as a result of the Settlement Agreement.

In summary, this analysis follows the broad assessment guidelines established by the framework of economic theory and the application of empirical analysis to the determination of economic value. As reviewed above, the broad foundations of microeconomic theory and cost-benefit analysis are drawn upon to assess the reasonable value of the reformed and modified business practices and initiatives acknowledged in the parties' Settlement Agreement. It is the undersigned economist's opinion, developed with a reasonable degree of economic certainty, that the estimates in this report are conservatively low and are limited to analysis of class-members. This analysis excludes other societal interests and stakeholders that would typically be included in a comprehensive cost-benefit analysis.

## B.    Correcting Market Externalities

Before briefly outlining this report's conclusions, it is useful to identify the manner in which economics provides the framework for valuation undertakings. By definition, economics is the study of how society values its resources.  Economists widely agree that a society's resources -- naturally occurring, human, and capital -- are valued by a combination of their usefulness, their abundance or scarcity and prevailing supply and demand conditions. Ultimately, the value of a resource is reflected in its price.  Natural resources – the earth's bounty of land, minerals and water, to name a few naturally-occurring resources -- are valued by the dollars spent to bring them to market, where supply conditions meet demand.  Capital, often referred to as man-made means of production, is valued by its role in transforming natural resources into usable final goods and services.  Finally, labor – the human resource – is valued by its ability to work with capital and natural resources in delivering a product with timely and efficient effort.

In assessing the value of a resource, economists rely on factual information, assumptions and forecasts. In those rare instances when the basic facts about a resource are known and generally agreed upon, economic assessment is often straightforward.  When basic facts are subject to interpretation and conflict,

analysis and review are critical.  When forecasts become part of the equation, any number of conflicting interpretations may arise.  Assessment proceeds with the recognition that underlying premises, assumptions, and expectations are often controversial. As a result, the undersigned economist is behooved to present associated benefits to consumers at several available price levels and over multiple time horizons.

In evaluating the reasonableness of those price levels, it is important to note the legislative history and statutory language of any public policy may be relevant when considering the societal benefit that may result from the enactment of the public policy. With respect to the TCPA, Congress acknowledges prospective gains in societal benefit by prohibiting non-consensual telephone solicitations when it provided for the recovery of actual monetary loss or statutory damages in the amount of $500 for each such violation, whichever is greater.  In the case of willful violations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times $500, or $1,500.[4]  And certainly, there are members of the class who value such protection in the amount of $500 dollars or more.

In the instant matter, we pursue a more conservative approach by identifying several willing-to-pay price points based on the most conservative conclusions of Do-Not-Call research. Table 1 in Appendix 2 summarizes these values ranging from a minimum of $0.55 to a maximum of $98.33.[5] Each value represents a willingness-to-pay for the benefit of not receiving unwanted phone calls.  It is from these values that we derive our best estimate of the present value of the post-settlement remedial relief using an *average* willing-buyer-price-point. With the recognition that there are short-term and long-term benefits associated with remedial relief delivered by the Settlement Agreement, the undersigned economist has calculated annual values for class-members for the next five years at three price levels referenced in Appendix 2.

This study concludes that a conservative measure of remedial relief at an annual price-to-avoid of $3.22 per year is **$1,024,353** for class members (see Appendix 1, Table 1 and Table 1.B).

## IV.  CONCLUSION

As reviewed herein, it is my opinion – held with reasonable economic certainty – that the economic value of the non-monetary benefits bestowed by the Settlement Agreement on class members is at least **$1,024,353**.

---

[4] 47 U.S.C. § 227
[5] The sources of all values are provided in Appendix 2.

This Assessment does not cover any additional broad societal interests and their values, and once again remains a conservative assessment of the value of the Settlement Agreement in this matter.

In closing this report, the undersigned economist is available to respond to any question raised about the methods and procedures used in reaching the conclusions herein.

The above-cited appendices follow.

Jon Haghayeghi, Ph.D.

**APPENDICES**

**APPENDIX 1**

**VALUING REMEDIAL RELIEF**

TABLE 1

SUMMARY TABLE

PRESENT VALUE OF REMEDIAL RELIEF FOR INDIVIDUALS IMPACTED BY WEST SHORE HOMES
2021 TO 2025

Erica Beiswinger, individually, and on behalf of all others similarly situated, Plaintiff
v. West Shore Home LLC

Case No. 3:20-cv-01286-HES-PDB, United States District Court for the Middle District of Florida

| Number of members of the settlement class benefiting from the absence of undesired phone calls | Aggregate Present Value of Remedial Relief from Non-Consensual Telemarketing Calls with Willingness-to-Pay Methodology and Prices Ranging from $.55 to $8.25 annually | | | | | |
|---|---|---|---|---|---|---|
| | $.55 / year | | $3.22 / year | | $8.25 / year | |
| In 2021, the expected annual number of non-consensual telemarketing calls made | 318,122 | $174,967 | [1] | $1,024,353 | [2] | $2,630,869 | [3] |
| For 5 years (2021 to 2025), the expected number of non consensual telemarketing calls | 1,590,610 | $849,615 | [4] | 4,974,109 | [5] | 12,775,120 | [6] |

[1] If all impacted members of the settlement class were willing to pay $.55 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.A, Column 7. Varian, Hal, Fredrik Wallenberg, and Glenn Woroch, "Who Signed Up for the Do-NotCall List?" School of Information, University of California, Berkeley, June 15, 2004.

[2] If all impacted members of the settlement class were willing to pay $.55 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.A, Column 8. Varian, Hal, Fredrik Wallenberg, and Glenn Woroch, "Who Signed Up for the Do-NotCall List?" School of Information, University of California, Berkeley, June 15, 2004.

[3] If all impacted members of the settlement class were willing to pay $3.22 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.C, Column 7. Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533

[4 ]If all impacted members of the settlement class were willing to pay $3.22 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.A, Column 8. Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533

[5 ]If all impacted members of the settlement class were willing to pay $8.25 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.B, Column 8 Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533

[6 ]If all impacted members of the settlement class were willing to pay $8.25 annually in order to avoid the cost of experiencing telemarketing calls. See Table 2.C, Column 8. Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533

For a complete review of willingness-to-pay methodology, see Anthony E. Boardman, David H. Greenberg, Aidan R. Vining, and David L. Weimer, **Cost-Benefit Analysis, Concepts and Practice**, Prentice Hall, 4th Edition, Boston, 2011, pages 81-99.

TABLE 2.A

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 1: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

Erica Beiswinger, individually, and on behalf of all others similarly situated, Plaintiff
v. West Shore Home LLC

Case No. 3:20-cv-01286-HES-PDB, United States District Court for the Middle District of Florida

| | COL 1 | COL 2 | | COL 3 | | COL 4 | COL 5 | COL 6 | COL 7 |
|---|---|---|---|---|---|---|---|---|---|
| | YEAR | SIZE OF SETTLEMENT CLASS | | ANNUAL WILLINGNESS-TO-PAY | | EXPECTED BENEFIT TO CONSUMERS | DISCOUNT FACTOR | PRESENT VALUE OF EXPECTED BENEFIT | CUMULATIVE PRESENT VALUE OF EXPECTED BENEFIT |
| | | | | | | | | COL 5 / COL 6 | |
| | | (#) | | (#) | | ($) | ($) | ($) | ($) |
| 0 | 2021 | 318,122 | [1] | 0.55 | [3] | 174,967 | 1.000 | 174,967 | 174,967 |
| 1 | 2022 | 318,122 | | 0.55 | | 174,967 | 1.000 | 174,967 | 349,934 |
| 2 | 2023 | 318,122 | | 0.55 | | 174,967 | 1.018 | [4] | 171,856 | 521,791 |
| 3 | 2024 | 318,122 | | 0.55 | | 174,967 | 1.051 | 166,439 | 688,229 |
| 4 | 2025 | 318,122 | [2] | 0.55 | | 174,967 | 1.084 | 161,386 | 849,615 |
| | Total | | | | | | | 849,615 | 849,615 |

[1] The settlement class includes 318,122 individuals. The start date of this analysis is January 1, 2021.

[2] This model terminates December 31, 2025, or after five years.

[3] Research indicates that lowest estimated willingess-to-pay for privacy from telemarketers is $.55 annually. See Appendix 2, Table 1.

[4] Factors in this column are based on yields on U.S. Treasury Securities as of April 8, 2022.

TABLE 2.B

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 2: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

Erica Beiswinger, individually, and on behalf of all others similarly situated, Plaintiff
v. West Shore Home LLC

Case No. 3:20-cv-01286-HES-PDB, United States District Court for the Middle District of Florida

| | COL 1<br>YEAR | COL 2<br>SIZE OF SETTLEMENT<br>CLASS | | COL 3<br>ANNUAL<br>WILLINGNESS-TO-PAY | | COL 4<br>EXPECTED BENEFIT TO<br>CONSUMERS | COL 5<br>DISCOUNT<br>FACTOR | | COL 6<br>PRESENT VALUE<br>OF<br>EXPECTED BENEFIT | COL 7<br>CUMULATIVE<br>PRESENT VALUE<br>OF<br>EXPECTED BENEFIT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | COL 5 / COL 6 | |
| | | (#) | | (#) | | ($) | ($) | | ($) | ($) |
| 0 | 2021 | 318,122 | [1] | 3.22 | [3] | 1,024,353 | 1.000 | | 1,024,353 | 1,024,353 |
| 1 | 2022 | 318,122 | | 3.22 | | 1,024,353 | 1.000 | | 1,024,353 | 2,048,706 |
| 2 | 2023 | 318,122 | | 3.22 | | 1,024,353 | 1.018 | [4] | 1,006,142 | 3,054,847 |
| 3 | 2024 | 318,122 | | 3.22 | | 1,024,353 | 1.051 | | 974,423 | 4,029,271 |
| 4 | 2025 | 318,122 | [2] | 3.22 | | 1,024,353 | 1.084 | | 944,839 | 4,974,109 |
| | Total | | | | | | | | 4,974,109 | |

[1] The settlement class includes 318,122 individuals. The start date of this analysis is January 1, 2021.
[2] This model terminates December 31, 2025, or after five years.
[3] Research indicates that baseline willingness-to-pay for privacy from telemarketers is $3.22 annually. See Appendix 2, Table 1.
[4] Factors in this column are based on yields on U.S. Treasury Securities as of April 8, 2022.

TABLE 2.C

PRESENT VALUE OF REMEDIAL RELIEF

SCENARIO 3: VALUE OF AVOIDING UNWANTED TELEMARKETER PHONE CALLS

Erica Beiswinger, individually, and on behalf of all others similarly situated, Plaintiff
v. West Shore Home LLC

Case No. 3:20-cv-01286-HES-PDB, United States District Court for the Middle District of Florida

| | COL 1<br>YEAR | COL 2<br>SIZE OF SETTLEMENT<br>CLASS | | COL 3<br>ANNUAL<br>WILLINGNESS-TO-PAY | | COL 4<br>EXPECTED BENEFIT TO<br>CONSUMERS | COL 5<br>DISCOUNT<br>FACTOR | COL 6<br>PRESENT VALUE<br>OF<br>EXPECTED BENEFIT<br><br>COL 5 / COL 6 | | COL 7<br>CUMULATIVE<br>PRESENT VALUE<br>OF<br>EXPECTED BENEFIT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | (#) | | (#) | | ($) | ($) | ($) | | ($) |
| 0 | 2021 | 318,122 | [1] | 8.27 | [3] | 2,630,869 | 1.000 | 2,630,869 | | 2,630,869 |
| 1 | 2022 | 318,122 | | 8.27 | | 2,630,869 | 1.000 | 2,630,869 | | 5,261,738 |
| 2 | 2023 | 318,122 | | 8.27 | | 2,630,869 | 1.018 | [4] | 2,584,097 | 7,845,835 |
| 3 | 2024 | 318,122 | | 8.27 | | 2,630,869 | 1.051 | 2,502,634 | | 10,348,468 |
| 4 | 2025 | 318,122 | [2] | 8.27 | | 2,630,869 | 1.084 | 2,426,651 | | 12,775,120 |
| | Total | | | | | | | 12,775,120 | | 12,775,120 |

[1] The settlement class includes 318,122 individuals. The start date of this analysis is January 1, 2021.

[2] This model terminates December 31, 2025, or after five years.

[3] Research indicates that central willingness-to-pay for privacy from telemarketers is $8.27 annually. See Appendix 2, Table 1.

[4] Factors in this column are based on yields on U.S. Treasury Securities as of April 8, 2022.

**APPENDIX 2**

**SUPPORTING DOCUMENTS FOR VALUING WILLINGNESS-TO-PAY**

| TABLE 1 |
| --- |
| **VALUE OF PROTECTION FROM NON-CONSENSUAL SURVEY CALLS:<br>WILLING BUYER'S PRICE POINTS** |

| PRICE PER YEAR | SOURCE / SUPPORT |
| --- | --- |
| **$0.55** | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of **$0.55** to $33.21 per household per year. |
| **$3.22** | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533 |
| **$8.25** | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (June 2007). Available at SSRN: https://ssrn.com/abstract=1000533 or http://dx.doi.org/10.2139/ssrn.1000533 |
| **$13.19** | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (September 2007). The perceived value of the "do not call" registry to rangefrom **$13.19** to $98.33 per household. The implied national gain inconsumer welfare (relative to the state level registries) ranged from $1.42 to $11.62 billion. |
| **$23.88** | Nomorobo app charges **$1.99** per month for Robocall Blocking. https://play.google.com/store/apps/details?id=com.nomorobo&hl=en |
| **$33.21** | Varian et al.'s (2004) estimate ranged from $60 million to $3.6 billion a year. With 108.4 million households, this was equivalent to a range of $0.55 to **$33.21** per household per year. |
| **$35.88** | Hiya Charges Users **$2.99** per month to block calls via iOS app. https://blog.hiya.com/hiya-premium-providing-more-value-to-the-phone-experience/ |
| **$35.88** | Verizon charges **$2.99** per month for its Call Filter. https://www.verizon.com/solutions-and-services/call-filter/ |
| **$47.88** | Robokiller - Robocall Blocker charges **$3.99** per month to block spam calls. https://play.google.com/store/apps/details?id=com.robokiller.app&hl=en_US |
| **$98.33** | Png, Ivan P. L., On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry (September 2007). The perceived value of the "do not call" registry to rangefrom $13.19 to **$98.33** per household. The implied national gain inconsumer welfare (relative to the state level registries) ranged from $1.42 to $11.62 billion. |

**Measures of Central Tendency:**

| | |
| --- | --- |
| **Mean:** | **$30.03** |
| **Median:** | **$28.55** |